Title VII makes it unlawful for an employer to discriminate against an individual with respect to the terms and conditions of the employment of the individual. Title VII makes it unlawful to discriminate because of national origin. We're here basically for two reasons related to the trial court's instructions. One is failure to instruct on two key theories that are warranted by the facts, retaliation and a stand-alone failure to investigate claim. The other reason is the instruction that the trial court did give on the national origin claim was painted in that it focused on the conduct of supervisors. And then having instructed to that effect, there was a change during deliberation so that the verdict form was made to read that the individual supervisors who discriminated had to be listed. Nothing in Title VII talks about discrimination by supervisors. It talks about discrimination by a defendant. In this particular case, it prejudiced Ms. Graves because first of all, counsel didn't have a chance to address that specific requirement that the individual supervisors had to be listed. Perhaps if she had known that, the argument could have been made somewhat differently. There was evidence, as I've discussed in the brief, not only of discrimination by the three principal supervisors, Jackson, Pusko and Bogra, but also other people that were involved as supervisors and involved in Ms. Graves' decision-making. As well, there was institutional discrimination, which was discussed against Hispanics in general. We had two other Hispanic employees who talked about their own particular circumstances. Similarly, the 1991 Civil Rights Act says nothing about discrimination by supervisors. Rather, it talks about contributing toward discrimination. That is primarily our principal objection. We didn't get a fair shot on this national origin discrimination claim. A fair shot would have been simply to instruct the jury based upon the standard jury instruction. Your exact problem is that the jury, however, found that there was no discrimination by anybody, so they never got to the question of whether there was discrimination by A, B or C. What difference did it make? Well, first of all, the trial court, when it introduced the new verdict form, repeatedly talked about you have to find that there's discrimination by A, B or C to answer number yes or no to the first question. That's in the excerpt of record a number of times he talks about discrimination by supervisors. But is your basic theory that this has always been somewhat confusing about what we mean by intent when you have an entity, but is your theory that they should have also said X, Y and Z? That's the problem? Or is the problem because there were other supervisors too? Or is the problem that you could have some kind of amalgamated intent such that it doesn't have to be, it doesn't actually have to be in the mind of any particular person, but could be by the entity as a whole in some more amorphous sense? Well, I take the latter view, Your Honor. I do think an amalgamated intent constitutes intent. I'm sorry, I can't hear you. I do think an amalgamated intent is sufficient to constitute intentional discrimination under Title VII. I think that's clearly true. So it's kind of a fictional intent? It isn't really anybody's motive? The particular problem I have here, Your Honor, is that the Supreme Court has said that circumstantial evidence is sufficient. You don't need direct evidence in order to do that in the Desert Palace v. Costa case. When the jury is focused on three particular people, that gets a little closer to a direct evidence requirement. Say what specifically A did that's discriminatory, especially in a case like this where the defendant's theory is that Mr. A, Mr. B and Mr. C could not have discriminated because they all have some sort of tie. I'm going to address the other main issue, which is whether the instructions were inadequate because they didn't provide for finding liability based on customer harassment. Yes, Your Honor. I think there's much in these facts that show that Arlene Gray's problems were because of her national origin. The statute talks about discrimination because of national origin. When someone explains to the postmaster, you've taken an American's job, I'm not taking orders from a Spanish postmaster, that's because of her national origin. When a newspaper article which covers the area reports on the controversy in terms of the thick accent from her native Honduras and links the customer complaints of rudeness to the accent, that's because of national origin. When a representative from NAPIS, the Postmaster Association, states in a formal interview that being Hispanic is offensive, that's because of national origin. When the same individual says that having an accent is offensive, that's because of national origin. When Mr. Fusco, who goes out to Willamina to investigate what's going on and why he thinks there's a problem, covers up his conversation with the mayor about whether there was prejudice because of culture, that's because of national origin. What's the authority for being responsible for community reactions based on race or national origin? Your Honor, the authority is starting with Little v. Windermere Realty and that line of cases which says an employer can be liable for customer abuse. I acknowledge that the facts in this case are somewhat unique. It's not the typical case where, for example, you have a waitress in a restaurant who is being harassed by a customer, but the principles are the same. You've got a postmaster out there who, yes, is responsible for conduct inside the post office, but she's having these tremendous problems being adjusted to by the community. And her supervisor, primarily Mr. Bogoroff, just sits on his hands. He doesn't do anything about it, and the record is replete with evidence that he was told about this particular problem. She had lots of problems. The defendant's brief certainly raised all of those, but part of the problems was her national origin, the fact that some aspects of this community didn't like having to take orders. And he was told before the action that's at issue here that she felt that a lot of the complaints were based on, and a lot of the way she was being treated was based on, bias of the customers. Yes, Your Honor. In 1994, shortly after she took office as Willa Minor Postmaster, Ms. Graves testified that she repeatedly told Mr. Bogoroff that part of her problem was because of national origin discrimination. In 1995, Mr. Bogoroff was aware that there was a petition in the area, and he wrote a note to Ms. Graves saying, is there a petition in the area? It looks like this is an attempt to gather signatures against you. She testified that throughout the controversy, she was telling Mr. Bogoroff about the problem and related it to her national origin. The most important witness on this, however, is Consuela Leitner. Even if you don't believe anything Ms. Graves says, Leitner is a Cuban-American official who was a personnel official at the time, and she transferred in mid-summer 1996. She testified that she told Bogoroff that she had received complaints from Graves about national origin and communicated that to Bogoroff, and then Leitner transferred off to be a postmaster elsewhere. Now, Bogoroff said he just didn't recall. He didn't deny this, but he just said, the first I remember was right around the investigative interview that she told me about these customer complaints. That was March 21, 1997. It's very clear in the transcript, which is in the supplemental excerpt of review, that she was complaining about national origin. She says, I'm not wanted because I'm an outsider. Counsel has also included her preliminary notes that she prepared prior to driving over there where she talks about, you know, if I had blue hair and blond hair and blue eyes, things perhaps would have been different. That's the same interview which prompted Mr. Bernal, who was there to represent her, to comment that being Hispanic and having an accent is offensive. So there's lots of evidence that the employer was told, had awareness that this problem was related to national origin. And the judge's instructions, did they preclude a finding? What state of mind does the employer have to have at that juncture? Let's suppose all this is true. What's the employer supposed to do, or what makes the employer liable? It's a negligence standard, Your Honor, just like coworker harassment, that if they knew or should have known that there's a hostile work environment. It's a little stronger than that, I think, but it's something under, it's under intent. It's not intent as such. Yes, it's either knowing or having reason to know that there's a customer harassment going on. I think it's the same standard as you would have with coworker harassment. It's a negligence standard as opposed to a vicarious liability. What's the employer supposed to do in this instance? Was the employer supposed to stop it, or was the employer supposed to at least not act on it? Well, first of all, they have to investigate it. They can't just sit on their hands and pretend like it doesn't exist, which is what happened here, and I was right. I guess, let me rephrase my question. Was this a harassment claim, or was it a claim that went to the adverse action and basically said that the adverse action was being fueled by complaints that were themselves discriminatory, which is a slightly different theory than saying that they shouldn't have left her in this town with all these people who were racially harassing her or harassing her on the basis of natural honor. Those are different things that lead to different theories, different remedies. And since there's different adverse actions, I think it's both. I think originally that her contention was she needs support. She needs management support like they gave to Janet Batchelor and the other community. She needs at least something tailored to the circumstances, perhaps just a statement on the door that national origin harassment is illegal and it's going to be investigated by the postal inspectors, anything. The theory was in the complaint and was in the pretrial order, is that right? I believe so, yes, yes. And then, of course, our theory was also that she got disciplined because of her national origin. And what happened was that eventually this situation got out of hand when this fellow Greenhill became so obsessed with her he wanted to drive her out of the town. There's nothing linking him to a national origin problem, is there? Well, some of his comments in the newspaper are right on the edge. He talks about public lynching and this is our town, not her town and some of those kinds of things. And, again, our theory was that Mr. Bogoroff and Mr. Jackson primarily simply didn't do anything in order to deal with this problem, gave in to Mr. Greenhill. And they called in Graves for an investigative interview and they proposed to her some sort of a disadvantageous transfer, which she didn't want, because this wasn't her fault, in her view, related to her national origin. I understand your theory is that without the instruction that you requested, the jury couldn't consider these matters? No, they didn't have the stand-alone instruction. Now, clearly, we argued or my co-counsel argued to the jury in closing argument that they never investigated. But the trial judge said, I'm not going to let you say that that failure to investigate is illegal. Because the instructions clearly said that the supervisors had to have a discriminatory intent themselves, not simply fail to take care of somebody else's discrimination. Yes. As you began, especially by focusing on the supervisors. Yes. What we were deprived of is a stand-alone claim, which we think the facts warranted here on customer abuse, that they had an obligation to do something to remedy this racial harassment of the postmaster, based upon the facts that we offered. And we were deprived of that. We repeatedly asked for it, and the judge simply said, no, I don't see it here. I think there's scant evidence, and I'm going to give you that stand-alone instruction. But didn't he also say that it was his understanding that unless they were not enforcing it because of their own discriminatory motive, there was no cause of action? That's a different problem, and that's just what he said, I thought. Not what our law says. I mean, I actually think there may be something in that, but it's not what our case law says. Yes. I think that's related to the first point I was making, Your Honor, that the instruction he did give on national origin discrimination was at odds with what the law required him to instruct on. Counsel, simply because you asked for an instruction doesn't mean that you're entitled to one. And the district court says, looking at his opinion in order, that the scant evidence of such conduct here simply would not support such an instruction. What's our standard of review for reviewing that? He's not saying that you didn't have any evidence at all. He's saying that the evidence really isn't sufficient to warrant the giving of an instruction. I thought it was a – I think it's either abuse of discretion or a mixed standard. I'm a little unclear on what we cited on that, Judge. Was he meaning that the evidence was scant, that it was racial or origin, or that there was scant evidence that the community was dead cent against her? In other words, I mean, there were a lot of other reasons for the community to be upset. Very tight enforcement of kind of a not common sense enforcement of the regulations. Like, for example, holding the rural customers mail for two weeks because he didn't have a proper post, you know, post office box. But there could be those things. And is the judge saying that there is scant evidence that the community resistance to her was because of racial matters or national origin? I think what he's saying is there is scant evidence that it was really the national origin. We presented the various comments. Some of our evidence dealt with threats, for example. There are three or four very specific threats. Now, none of them specifically mentioned her national origin, but in the context of all the other things, I think it's a fair inference that that was related to her national origin as well. And that's part of – Why is that a fair inference with all these other matters that the community was upset about? I think the jury could find in deciding whether there was a hostile environment here or not that when you've got a handful of people who – Now, hostile – and that's one other thing that kind of bothers me. Usually a hostile environment refers to what the employees that the management can do something about are creating a hostile environment. I'm not sure that just strictly a hostile environment in the community is something that managers can do anything about. I think that that's what little – I may be wrong about this, but I thought that little addressed the hostile work environment. That was the situation where a customer service representative was raped by a client of the firm. And that was a hostile work environment based upon, granted, a single very severe incident. But you could exclude that person from the client. Yes. If it's a matter of a waitress or something, you can keep the customer out. But if you've got a whole community upset and the editor of the paper upset, I don't know what you can do about that. Well, they could have, for one thing, talked to the mayor because the mayor was the principal problem, one of the big players here. And according to the plaintiffs, the mayor made this racist comment to her. The mayor also received some of Ms. Graves' employees and heard about their problems and actually worked with the employees to undermine Ms. Graves. Now, originally, Ms. Graves, one of her workers, Carolyn Murphy, applied for the job and didn't get it. Murphy had ties with the mayor and close community ties. So she's working with the mayor. This Rosalie Smith, who was involved in losing the Green Hill mail, had close community ties as well. So I think, Judge, I think there were things that could have been done to stop this problem. Mr. Spalding, if you want to reserve any time, you're down to about a minute and a half. Okay. I'll reserve. Thank you. Thank you. If it pleases the Court, my name is Ron Silver. I'm an assistant United States attorney, and I defended the Postal Service during this trial. I'm representing them here. It's hard to hear you. I'm sorry, sir? Difficult to hear you. What do you mean? Those, I don't think, amplify. I think they're for recording purposes. Aha. Just speak up. In that case, I will have a sip of water and speak up. I think they have some amplification. Oh, thank you, Your Honor. I want to start by making reference to something that my opposing counsel just said. When questioned by the Court, what could they have done? And one of his comments was they could have talked to the mayor. And I think it's essential to understand that they did that. John Fusco. The question is whether it should have gone to the jury. Well. The question is what basis was there for not sending to the jury a theory based on, and I think there are two slightly possibly different theories, one which would be a harassment theory and one which might be a sort of cat's paw theory that says that all the people who are complaining were themselves discriminatory, or some of them were, and that the agency at least had an obligation to discount the discriminatory complaints, if there were any. Those would be two slight variations which would take into account, which wouldn't require, as the instructions did, a discriminatory motive on the part of the supervisors. Thank you, Your Honor. I think I was, one of the things that's involved in answering that question is looking at what did the managers do. And so in that respect, I wanted to say that John Fusco went to Willamina. Fine, then he wins, but why doesn't he go to the jury? That's what I want to know. Because it's the judge, in answer to the question that was asked about what's the standard of review here, in the Costa case, the circuit has talked about when, how a jury instruction is going to be used is based on a judge's evaluation of the evidence. It should be on an abuse of discretion standard. How can it be strictly an abuse of discretion, though? Because at some point we're going to say, you know something, there's enough evidence here that it's got to go to a jury. It can't simply be an abuse of discretion standard, can it? Well, it's probably more, I can agree that it could be a mixed issue, where how the judge is looking at the facts should be an abuse of discretion, but also how he's applying that to the law is probably going to be a de novo review. Well, one of the things that the judge said was he gave two reasons in his written opinion and maybe another one in his oral comments on why he didn't send some theory of this kind to the jury. Now, you agree that he didn't, that the jury could not, on the instructions that they were given, have found for the plaintiff in any respect based on the complaint, on any notion that the complaints that were being made were discriminatory, unless they found that the supervisors had illicit motives. Is that correct? That sounds correct to me, Your Honor. So the judge, in his opinion, gives two reasons. First, he says that there's scant evidence of such conduct, discriminatory conduct by customers and employees. And then he says, in addition, as postmaster at Wilhelmina, plaintiff herself had the authority to address any discriminatory conduct. Now, what's the pertinence of that? Well, it goes to, there's all kinds of questions there, and I want to answer all of them at once. So let me slow myself down. Okay. In terms of the second thing you raised, namely that she is sort of the master of the post office, to the extent that there is a theory of liability that somehow the post office is responsible for not helping her with the problem that she's got the whole town upset, to the extent that it's about what's going on inside her post office, if there's no evidence that she's done anything to deal with it inside her post office, then that's very strong evidence that there's nothing to deal with. And, in fact, the plaintiff has conceded that in his reply brief, at page 15 and 16 of the reply brief, plaintiff says that unruly customers within the post office was not the problem here. And so you have a straight comment by Mr. Bailey that you've taken an American's job. You have the mayor, who denies it, saying, I'm not going to listen to a Spanish postmaster. You have one customer saying, I'm not going to listen to a Hispanic postmaster. And there was such strong evidence. And then we have threats, like death threats. But none of that. We have community meetings trying to oust her. Well, the community meeting, I think, is a separate item, because it happens right at the same time that the plaintiff hangs on to Mr. Greenhill's mail. So I want to go to the earlier issues of the threats. I mean, a perfect example of that, and it kind of goes to what Judge Hunt was asking in terms of what were they mad about. You have Arlene Spencer, a friend of the plaintiff's, testifying that she's in a diner, and one man says, if I don't get my damn check, I'm going down and barricading that post office. Now, this is not a man who's censoring his language. This is not a man who's trying to be politically correct. This is a man who is angry. And there's no evidence when he's saying, I'm going to barricade that post office, he's not saying, and I'm going to get that damn Hispanic postmaster, or whatever other inappropriate ethnic slur he could have used. There's no evidence that was presented anywhere by anybody that whenever anybody got mad enough to really cross over the boundary in terms of just being out in a bar or being out and about and saying really crummy things about Ms. Graves, that they ever started using her ethnic origin as part of what they were mad about. There is no question. There was a tremendous amount of evidence that this town was angry at Ms. Graves. And the person who wrote the newspaper article seemed to think that this had something to do with it because it was in the newspaper article. Well, that's interesting, Your Honor. Looking at the excerpt of record, the plaintiff is quoted in the article as saying that she admitted that her accent made it difficult to understand her. And so the man writing the article is saying that she is having a problem, perhaps, because of her thick accent. But it's not, you know, and then there's the fight about whether she's rude. But it's not about, you know, discrimination. And I think I would like to go through some of the things that the plaintiff has cited because I think it's important to look at these things in specifics because this is the evidence that Judge Gelderts was reviewing when he comes to the conclusion that there is scant evidence. If you look at the issue of John Fusco, the notes that he supposedly has suppressed, what's in those notes is his notation that this is not about her ethnic origin. Well, that doesn't go to proving the fact that it's about her ethnic origin. He's saying his observation is it's not about her ethnic origin. When Mr. Bernal was – two things about Mr. Bernal. The first is, as he himself – he is Hispanic. When he is in that meeting with Mr. Bogroff and he makes the comments about her accent being offensive or being Hispanic as being offensive, he's trying to be her advocate and give up a reason for why she's having trouble in the town. He's not basing it on any independent knowledge. He's examined during the trial. I mean, the basic question here is, how much evidence does one need to get to a jury on a theory of this kind? I mean, you have to agree that there was some evidence, that there were some people who seemed not to care for her, at least in part because of her origin, and that she perceived that as being the problem, and she communicated to her supervisors that she believed that to be the problem. And they didn't think that was the problem. They did nothing. And there was some evidence that they had no protocol for dealing with racial harassment, and they didn't. So the question is, why doesn't that get to a jury? That's what I'm having a hard time with. I can understand why it loses, but why doesn't it get to a jury? I want to make one point, because it's a terrific question. I want to make one point, and then I'll try to give a broader answer, because there's been a lot of talk about the fact that the employers did nothing. And I think it's so important, apropos of this issue of what was the amount of evidence, because clearly there's got to be a case where there's enough evidence to get to the jury, and there have to be cases where there's not enough that you don't. And so in that issue of what makes enough evidence, I still think it's so important to get just very briefly, in that meeting that John Fusco had with the mayor, what John Fusco said to the mayor was, Arlene Graves stays. She is not leaving unless she wants to leave. And so one of the ways you get to the jury is if you show there is significant evidence that the management did nothing with the problem. And when the evidence is instead that management was dealing with the problem, then that moves the scales to a different place when you decide whether it goes to the jury. So the question that the court is asking is how much is enough evidence? Well, that's not the basis on which the judge specified that it was. You're not giving an instruction. He says because there's scant evidence, not that they didn't respond. Well, there's scant. I think, Your Honor, that the issue of scant evidence is scant evidence that is favorable to the plaintiff's theory. And if you have scant evidence of such conduct. Well, that's true. I apologize. And if you get down to the question of race, there was scant evidence. A stray comment here, a stray comment there. And that was it when you get to the issue of race. Or national origin. Or national origin. Yes. Synonymous in this case for us. There just was not much there, and it became ‑‑ I think Judge Jelders was trying to say, you know, there's so much the jury is going to have to talk about. Is there enough to make this worthwhile? And keeping in mind that the standards that this circuit has set are the standards that come out of cases such as the waitress who gets abused by the customer and then the manager says, I don't care where he touched you, go back and serve him some more coffee. Or the case of, you know, of course Little where the rape occurs. But if my recollection serves me correct, in the case of the mime at the hotel in Las Vegas, this circuit did not allow that to go to the jury, even though a customer started to grope the mime. This circuit said that was not enough to go to a jury. And so there does have to be a place where you decide this isn't enough and this is. And in this case, where you're really talking where you can confine it down to race, when there are so few instances, the allegation about Deborah Isley, the allegation about the mayor, the allegation about Mr. Bailey, who's long gone, I mean, that's about the only time we get to the issue of race, national origin. The other stuff is all about the fact that, you know, she won't give people their mail, even if their address is across the street. You know, and there was uncontested. I mean, one odd thing here was that the jury wrote this little note with its verdict and it obviously felt that there was something that was wrong here that it wasn't able to deal with. It was unhappy about something about its limited role. You can't quite tell whether that's what that's about, but it could be about this. They could have thought that there really was a problem. It just wasn't encompassed in their instructions. Your Honor, we don't know what the jury was thinking. I want to give you my thoughts because your scenario is certainly a possibility. What I was seeing when I was in the courtroom was the jury – there was an adverse action. She got a disciplinary letter. Do you argue, by the way – the only other theory I could think of was that maybe you were arguing that the warnings and suspensions were not an adverse action. No, I did not argue that. So you never argued that there wasn't an adverse action. No, but I never argued that it was an adverse action. I didn't really spend much time at all there on my argument. But it wasn't a central question. There was no reason they should have felt they had to answer that question. No, except for the fact that the jury really seemed to be upset that they couldn't separate the two out. They really seemed to be upset that they only were going to be given the chance to either say yes or no, and they really wanted to split it. And truly, I don't know why they wanted to split it, whether they just thought it was unfair to not give Ms. Graves anything or whether they were concerned, as you've described, Your Honor, that it was a possibility. That could certainly have been the possibility. We just didn't know. And what we do know is there was an adverse action, and the jury just as likely could have felt upset that they couldn't speak to the fact that there was an adverse action, and somehow they were going to have to be saying that there wasn't one. Either one, I think, is a possibility. I just – the – Do you want to briefly address this jury verdict form? It's unusual. Have you ever seen this before? No, I had not. Are you talking about where he lists the supervisors? You know, it sort of came out of the blue for both counsel. My initial reaction was, oh, don't do that. And my initial reaction was that way because I frankly didn't think John Fusco had made a very good witness. And I had tried to sort of keep the arguments away from John Fusco in my closing argument, and I thought the jury was going to look at that form and say, well, we didn't like John Fusco. We're going to check that box, and boom, I lose. So my initial reaction was, oh, I don't want this. But then I sort of calmed down, and I thought, well, you know, I'm going to win this case because she did not get discriminated against, and so I'm just going to keep my mouth shut and let's just see what happens. But what is the basis for – he's not suing any of those individuals. None of the individuals can be liable under our law. Right, and the judge told him that. Why do you separate out individuals, and why, if this is an appropriate way to write an instruction as nobody ever done it before? Well, here's my reading Judge Gellerich's mind. I think, based on his comment that this was going to help him with post-trial motions, I think what he decided was that, just like me, I think he didn't think John Fusco had made a very good witness, but I think that he thought, just like me, that what John Fusco had done would not have – just didn't rise to the level of discrimination, and therefore, if the jury had decided that there was discrimination, and ultimately the only box they checked was John Fusco, I think he might have granted a motion for a new trial or a motion for judgment notwithstanding the verdict. That's what I think was going on. I don't know. He never got explicit with us. But I think that the thing that cannot be overlooked is that first the jury had to decide, was there discrimination? And they said no. As I was driving home last night, a very strange sort of thought pattern came to me, because I was thinking, what is the core of this thing? And all of a sudden, even though we're several months past, the opening to the movie A Christmas Carol ran through my brain, and the narrator is saying, Jacob Marley was dead. Of that we must be certain, for nothing else makes sense unless that is true. And what came to my mind was, this jury had nine days of trial testimony to decide, was Arlene Graves discriminated against? I mean, we basically had a brawl for nine days, and at the end of that brawl, that jury said it didn't happen. And so with respect to the odd thing that happened to the verdict form, with the fact that it had these names. Well, I don't know the record well enough to know this is a possibility, but suppose what they thought was, well, actually, A, B, and C supervisors didn't discriminate, but D supervisor did. And, but we're not allowed to rely on D supervisor because we have to find A, B's, B and C supervisor. Now, there may be no such person. I think what's so important there, Your Honor, because I appreciate that's a very appropriate possibility, but then you have to look at, it's actually record page 14. This was the pretrial order. This is what the plaintiff says was the discrimination. The Postal Service refused to intervene with the Willamina community to support the plaintiff. They disciplined the plaintiff for causing adverse publicity. They denied the plaintiff procedural safeguards. They disclosed plaintiff's employment information to the press. They denied her the benefits of the Hispanic program. They failed to promptly investigate plaintiff's claims of harassment. This, it was Jim Bogroff, it was John Fusco, it was William Jackson who are the people who are supposed to have done A through G. That's who this case was about. But B, F, and G never went to the jury, right? No, B was, B did go to the jury because that's the. . . No, I'm sorry, B did. A, F, and G never went to the jury. I'm sorry, E, F, and G? A, F, and G. Correct. But still, what we're talking about is Jackson, Bogroff, and Fusco. So that's why those names, those were the right names to use. Why the judge used them, I don't know. It wasn't something I asked for, didn't particularly want. But was it an error? I don't know. Was it harmless? Absolutely. Okay, you're out of time. Thank you very much. Thank you. You have a minute and 46 seconds. Thank you, Judge. Judge Bybee, the standard review is on page 42 of my blue brief, Nichols v. Azteca Restaurants, parties entitled to an instruction concerning his or her theory, if it's supported by law and has some foundation in the evidence. That's a mixed question of law and fact review de novo. Much of counsel's argument, appropriately enough, is devoted to the facts, and I think the central issue here is that the basic claim wasn't given to the jury so they could decide those facts. There was plenty to do with race. One comment that hasn't been yet made this morning is Mr. Bernal's reference to a perceived hindrance of an accent. Here he's responding to the talk among the postmasters where they'd all talked among themselves as of mid-'96 that Arlene Graves had a problem in Willamina, and they themselves related it to her race, and what Bernal said was this. But an accent and national origin aren't exactly the same thing. An accent could be a problem, and it wouldn't necessarily be a national origin issue. It might be and it might not be. It might be and it might not. One of the curious things about this case is the word rudeness, where many of these complaints against Ms. Graves were because of alleged rudeness, which is kind of in the mind of the beholder. By the same token, Ms. Batchelor had a lot of complaints, far more than Graves, actually. Same thing, rudeness. And this was an interesting aspect of the case, came up in depositions as well, is what does rude really mean, and it's kind of an amorphous term, but it certainly has room for national origin discrimination. Some people view it, especially in a small town, as rude when a person in authority is somebody they're not used to as a person of authority, whether it's a woman or a person speaking with an accent. Could you wrap it up in the next 30 seconds or so? Okay. I just want to briefly touch on the retaliation claim as well. We haven't discussed that yet, but there was a comment made, it was clearly protected activity of a threat of an EEO by Mr. Gates. The judge's basic conclusion there was so far down the road that it couldn't have been the reason why anybody was doing anything. Well, the judge felt that the discipline had to be, the adverse action had to be disciplinary, and that's where his mistake of law was, that it doesn't have to be disciplinary. The fact that she was disparaged in the press, locked out by giving the administrative leave, and the various other things that happened to her, really flowed from that remark and the things shortly before it. That remark happened on the 26th, I believe, of March. Four or five days before was when Graves said on the record during this investigative interview that I'm an outsider, this has to do with my national origin. They talked about a transfer to another place. Then they had this conversation between Gates, the NAPIS representative in Bogoroff, saying, well, we can deflect this whole thing by moving her over to Gaston, which had a more Hispanic community, which was a lateral transfer, which was disadvantageous and Ms. Graves viewed as punitive. She didn't do it, and as a result she got disciplined and everything else flowed through it. The offer from Bogoroff was, well, we'll call off this whole thing, no discipline, no adverse action if she accepts this. She stood up and this all flowed from it. Most importantly. Thank you, Judge. Thank you, Judge. The case of Gal Demmons v. Potter is submitted. Thank counsel. And the last case of the day and of the week, Confederated Tribes of the Yakama Nation v. Confederated Tribes of the Coalville Reservation. Thank you.
judges: Hug, Berzon, Bybee